## American Bank and Trust Company of Pennsylvania v. Windmill Dairies, Inc.

*Clinton J. Najarian*, for plaintiff.
*Edward C. McCardle*, for defendant and sureties.

EDENHARTER, *J.*, April 30, 1980—Plaintiff, American Bank and Trust Co. of Pa., filed a petition pursuant to the deficiency judgment act of July 16, 1941, P.L. 400, 12 P.S. §2621.1 et seq.,[1] to have

1. This act was repealed by section 2(a) [1227] of the Act of April 28, 1978, P.L. 202, 42 P.S. 20002(a) [1227], generally effective June 27, 1978 with the repeal of certain provisions to take effect two years after the said general effective date. The Act of July 9, 1976, P.L. 586, sec. 2, effective June 27, 1978, 42 Pa.C.S.A. §8103, is substantially a reenactment of the defi-

determined and fixed the fair market value of certain real estate situate in Richmond Township, Berks County. Plaintiff was the sole and successful bidder at a sheriff's sale in execution of a judgment confessed by plaintiff against defendant, Windmill Dairies, Inc. Answers to the said petition were filed by defendant and the following sureties of the obligation upon which judgment was confessed: Ralph O. Phillips and Bertha M. Phillips; Isaac Yates, Jr. and Grace Yates; Richard E. Miller and Barbara M. Miller; Edward Wilson and Lola Vee Wilson; LaVern R. Phillips and Sandra Phillips; Carl Newhart and Rosemary Newhart; and Joseph J. Morello and Agnes L. Morello. In addition, Joseph J. Morello and Agnes L. Morello filed a "Petition to Satisfy Judgment." The pivotal issues raised deal with the timeliness of plaintiff's petition and the fair market value of the real estate. After hearings held, we make the following

## FINDINGS OF FACT

1. Plaintiff is American Bank and Trust Co. of Pa. (bank), a Pennsylvania banking corporation having its principal office at 35 North Sixth Street, Reading, Berks County, Pa.

2. Defendant is Windmill Dairies, Inc. (Windmill), a Pennsylvania corporation with its last known address at R.D. #2, Fleetwood, Berks County, Pa.

3. On December 14, 1972 the bank made a loan of $700,000 to Windmill which was evidenced by Windmill's note no. 0347979 in the said amount

---

ciency judgment act. Plaintiff's petition was filed prior to the abovementioned repeals and citations will be to the Act of 1941.

bearing interest at the rate of eight and one-half percent per annum.

4. The said loan was secured by Windmill's collateral bond and mortgage, both dated December 14, 1972, which mortgage was recorded in the office of the Recorder of Deeds of Berks County, Pa. in Mortgage Book Volume 1156, page 93.

5. The said mortgage covered property owned by Windmill situate in Richmond Township, Berks County, Pa., containing 135.6 acres together with all the buildings and improvements located thereon (premises).

6. The said loan was also secured by a security interest in all of Windmill's livestock and the progeny thereof, inventory, equipment, and accounts receivable whether then owned or thereafter acquired.

7. Payment of the said loan was guaranteed by the following sureties, each couple having executed a separate suretyship agreement which contained a warrant of attorney to confess judgment in an amount limited to $100,000:

(a) Ralph O. Phillips and Bertha M. Phillips, Germansville, Pa.;

(b) Isaac Yates, Jr. and Grace Yates, 718 Berger Street, Emmaus, Pa.;

(c) Richard E. Miller and Barbara M. Miller, 1232 Club Avenue, Allentown, Pa.;

(d) Edward Wilson and Lola Vee Wilson, 286 Robin Dale Drive, Leola, Pa.;

(e) LaVern R. Phillips and Sandra Phillips, 87 El Reno Avenue, Nazareth, Pa.;

(f) Carl Newhart and Rosemary Newhart, 400 Fairview Street, Catasauqua, Pa.;

(g) Joseph J. Morello and Agnes L. Morello, 1776 Center Street, Bethlehem, Pa.

8. Windmill operated a jug milk store and convenience grocery market selling milk which was produced and bottled on the premises.

9. On August 12, 1975 Edward Wilson, president of Windmill, met with representatives of the bank and requested the bank's assistance in selling the company.

10. On November 20, 1975 Edward Wilson, Richard E. Miller, and Thomas Weaver (who had purchased the Windmill stock owned by Joseph J. Morello in 1974) met with representatives of the bank to discuss the said loan which was delinquent.

11. On December 2, 1975 Ralph O. Phillips, Isaac Yates, Jr., Richard E. Miller, Thomas Weaver, and Edward Wilson met with representatives of the bank and informed them that the stockholders of Windmill desired to sell the business as a going concern.

12. On February 4, 1976 after Windmill had ceased business operations, the bank became mortgagee in possession of the premises and, as such, undertook certain repairs and caused the buildings to be secured and winterized.

13. On or about February 20, 1976 the bank caused judgment to be entered on Windmill's bond in the principal amount of $650,188.01 together with interest thereon in the amount of $18,780.78 and an attorney's fee of $5,000.

14. On March 22, 1976 Ralph O. Phillips, Edward Wilson, Isaac Yates, Jr., Richard E. Miller, and Attorney Howard Yarus met with representatives of the bank.

15. The said meeting was requested by Attorney Yarus who stated that he represented "the sureties."

16. At the March 22, 1976 meeting repre-

sentatives of the bank stated that if the bank acquired title to the premises at a sheriff's execution sale, it would attempt to resell the premises at the best possible price for the benefit of all parties concerned.

17. At the March 22, 1976 meeting representatives of the bank stated that the bank would give Windmill and the sureties credit for the amount received on the resale of the realty and equipment, less costs.

18. On April 9, 1976 a sheriff's execution sale of the premises was held.

19. The bank was the only party to bid on the premises.

20. The bank was the successful bidder on the premises with a bid of $10.

21. On April 9, 1976 the balance due on said note no. 0347979, including principal, interest and late charges, was $662,602.74.

22. Subsequent to the said sheriff's sale, the bank undertook to sell the premises and received 29 separate inquiries from interested parties.

23. In May of 1976 the bank received an offer for the premises in the amount of $500,000 from James Stutzman Sons.

24. The bank rejected the said offer from James Stutzman Sons.

25. In May or June of 1976 the bank received an offer of $600,000 for the premises from Ernest and Joyce Miller.

26. The bank proceeded to arrange financing for the Millers through the Berks County Industrial Development Authority, but the Millers refused to sign a commitment letter and did not sign an agreement of sale.

27. In June of 1976 the bank received an offer of

$692,000 for the premises from Lloyd and Helen Kehl coupled with a request for financing in the amount of $1,052,000.

28. The bank was unwilling to approve the said request for financing.

29. On July 26, 1976 the bank listed the premises for a period of six months with a local representative of the United Farm Agency, Hellertown, Pa., at a listing price of $795,000.

30. The said agency is a nationwide company with its home office in Kansas City, Missouri.

31. The said agency deals primarily in farm properties and has from 625 to 650 offices across the United States.

32. In the fall of 1976 the said agency advertised the premises in the New York Star Ledger, the Philadelphia Inquirer, the Wall Street Journal, the Pennsylvania Farmer, and Hoard's Dairyman.

33. The said agency prepared a sales brochure for the premises which was mailed to 5,000 to 6,000 addresses throughout the country.

34. The said agency showed the premises to at least 30 prospective buyers during the period of the listing.

35. In September of 1976 the bank entered into an informal agreement with Lloyd and Helen Kehl to sell the premises for $692,000 contingent upon the Kehl's ability to obtain financing at another lending institution.

36. The said agreement expired on October 15, 1976 with no sale having been consummated.

37. In November of 1976 the bank received an offer from Kermit Dietrich to purchase the premises for $650,000 contingent upon the bank's providing a loan of $950,000.

38. The bank was unwilling to provide the re-

quired financing, and no agreement of sale was consummated with Dietrich.

39. On February 15, 1977 the bank entered into a formal agreement of sale with the Kehls at a price of $692,000 contingent upon the Kehl's ability to obtain financing in the amount of $1,300,000.

40. Prior to closing, which was scheduled for May 15, 1977, the bank was informed that the Kehls were unable to obtain the necessary financing.

41. After the Kehl transaction was terminated, the bank decided to sell the premises at a public sale and engaged the services of Louis Traiman Auction Company of Pennsylvania (Traiman), an auction company located in Philadelphia, Pa., which was experienced in the sale at auction of all types of real estate.

42. Traiman recommended to the bank that the premises be sold at an "absolute auction" (an auction without reserve) in order to obtain the best possible price.

43. On June 2, 1977 representatives of the bank met with Carl Newhart, Richard E. Miller, Ralph O. Phillips, LaVern R. Phillips, Edward Wilson, Isaac Yates, Jr., and Attorney Howard Yarus.

44. At the said meeting representatives of the bank stated that the bank intended to sell the premises at absolute auction.

45. Attorney Yarus objected to the sale of the premises at absolute auction.

46. The bank entered into an agreement dated June 3, 1977 with Traiman to sell the premises at absolute auction.

47. Traiman prepared a detailed pictorial sales brochure of the premises and mailed the said brochure to 4,423 prospective purchasers in August of 1977.

48. Traiman caused advertisements of the premises to be placed in 25 newspapers.

49. The bank prepared the premises for sale by cleaning, hauling away trash, mowing grass and otherwise causing it to appear more presentable.

50. The absolute auction of the premises occurred on September 17, 1977.

51. The absolute auction attracted a crowd of several hundred people and resulted in active bidding.

52. The premises were first offered at the absolute auction in eight separate parcels subject to receiving a higher bid on the premises as an entirety.

53. The sum of the highest bids at the absolute auction for the eight parcels was $434,745.

54. Traiman offered to sell the premises in various combinations of parcels but did not receive any bids thereon.

55. Following the offer to sell the premises in combinations of parcels, Traiman offered to sell the premises as an entirety.

56. LeRoy S. Hoover was the successful bidder at the absolute auction for the premises as an entirety with a bid of $445,000, and he entered into an agreement of sale with the bank for the premises on September 17, 1977.

57. On November 30, 1977 settlement was held on the sale of the premises to Hoover.

58. On November 30, 1977 the bank assigned its successful bid at the sheriff's sale to Hoover and the sheriff of Berks County executed and recorded a deed for the premises in the name of LeRoy S. Hoover.

59. The bank's petition to determine and fix the

fair market value of the premises was filed on December 16, 1977.

60. The fair market value of the premises as of April 9, 1976, the date of the sheriff's sale, was $522,900.

## DISCUSSION

The deficiency judgment act provides as follows: "Whenever any real property . . . is hereafter sold, directly or indirectly, to the plaintiff in execution proceedings and the price for which such property has been sold was or is not sufficient to satisfy the amount of the judgment, interest and costs and the plaintiff seeks to collect the balance due on said judgment, interest and costs, the plaintiff . . . shall petition the court having jurisdiction to fix the fair market value of the real property sold as aforesaid." 12 P.S. §2621.1. Act of July 16, 1941, P.L. 400, sec. 1, 12 P.S. §2621.1. "At such hearings the only issue before the court shall be the fair market value of the property sold at the time of said sale. . . ." 12 P.S. §2621.6. Section 6 of the Act further provides that, after the court makes its determination of fair market value, "[T]he debtor, obligor, guarantor, and any other person liable directly or indirectly to the plaintiff . . . for the payment of the debt shall be released and discharged of such liability to the plaintiff to the extent of the fair market value of said property . . . less the amount of all prior liens, costs, taxes and municipal claims not discharged by the sale, and also less the amount of any such items paid at the distribution on the sale . . . and thereupon petitioner may proceed by appropriate proceedings to collect the balance of the debt." 12 P.S. §2621.6.

The purpose of the act was discussed in Philip Green & Son, Inc. v. Kimwyd, 410 Pa. 202, 205, 189 A. 2d 231, 232-233 (1963), as follows: "[The] Act

was passed during the depression to deal with the inequity that an execution creditor could purchase real estate for a nominal amount at a forced sale and still retain the full amount of his judgment against the debtor. The solution to this problem was to reduce the judgment by the fair market value of the property instead of the actual sale price."

## TIMELINESS OF PLAINTIFF'S PETITION

Section 7 of the act, 12 P.S. §2621.7, requires a plaintiff to file the said petition within six months after the sale of the property. The same section provides the following sanction for failure to file a timely petition: "In the event no petition is filed within such period, the debtor, obligor, guarantor and any other person liable directly or indirectly to the plaintiff or plaintiffs for the payment of the debt shall be released and discharged of such liability to the plaintiff or plaintiffs."

The threshold issue in the present case is whether plaintiff has filed its petition within six months of the sale of the property. The resolution of this issue turns upon the meaning of the word "sale." The Pennsylvania Supreme Court in Marx Realty and Improvement Co., Inc. v. Boulevard Center, Inc., 398 Pa. 1, 6, 156 A. 2d 827, 830 (1959), held that, for purposes of the deficiency judgment act, a "sale" occurs upon delivery of the sheriff's deed. "Since the Act requires giving credit on the judgment to the extent of the fair value, no bidder has anything from which to give credit until he gets title, and hence no sale to him can be said to have taken place until a deed is delivered."

The holding in Marx Realty was followed by the Superior Court in Delaware Valley Factors, Inc. v. G. B. Echenhofer Co., Inc., 226 Pa. Superior Ct.

165, 313 A. 2d 318 (1973). In the Delaware Valley Factors case, approximately nine months elapsed between the fall of the hammer at the sheriff's sale and the delivery of the deed. Two months after the deed was delivered, plaintiff filed its petition to fix the fair market value of the property. The reason for the delay in delivery of the deed was not clear from the record, but apparently certain unpaid taxes which were owed by defendant created difficulty in securing the required corporate clearance from the Commonwealth. The Superior Court refused to depart from the rule of Marx Realty despite the delay in delivery. "Absent some clearer showing of culpability on the part of appellee or some prejudice to appellant's position, and considering how quickly appellee acted to fix fair value once the deed was delivered, we do not think the time between the sheriff's sale and the filing of the petition was so excessive as to constitute an exception to the rule laid down in Marx Realty." 226 Pa. Superior Ct. at 171, 313 A. 2d at 322.

In Shrawder v. Quiggle, 256 Pa. Superior Ct. 303, 389 A. 2d 1135 (1978), the sheriff's sale was held on May 28, 1975. On the same day, the sheriff gave plaintiff a deed form which plaintiff was to prepare. Nine months later, defendant petitioned the court to have the judgment marked satisfied. The reason for the delay in Shrawder was plaintiff's uncertainty regarding the constitutionality of the notice provisions governing sheriff's sales. The court held that this was not a justifiable reason for the delay and affirmed the lower court's order discharging the judgment against defendant. Although the Superior Court recognized the rule of Marx Realty and Delaware Valley Factors that the six month period does not begin to run until the deed is delivered, it stated that if a plaintiff delays unduly in

preparing the deed and presenting it for signing, he runs the risk of losing his judgment.

In Merriam v. Cedarbrook Realty, Inc., 266 Pa. Superior Ct. 269, 404 A. 2d 407 (1978), the Superior Court reaffirmed the holding of Delaware Valley Factors that bad faith is required to establish an exception to the rule that the six month period runs from the date of delivery of the deed. While the facts in Merriam are distinguishable from those in the present case, the following statement from the opinion is pertinent: "We continue to recognize that the sanctions provided for in the Act may be imposed by a court against an unduly dilatory execution plaintiff. Nevertheless, we agree with the court below that appellant has not demonstrated the bad faith required to invoke the Act in this case." 266 Pa. Superior Ct. at 274, 404 A. 2d at 409.

In the present case, the delay in delivery of the deed was not undue, nor was it the result of bad faith on the part of the bank. Between the fall of the hammer and delivery of the deed, the bank was diligently attempting to sell the premises at the highest possible price for the benefit of all parties concerned. Neither defendant nor the 'sureties voiced any objection to this procedure when the bank was conducting negotiations for sale of the premises. The period of time between the fall of the hammer, April 9, 1976 and the assignment of the bid to Hoover, November 30, 1977, was not excessive considering the length of time required to sell a property of this type.[2] If defendant or the sureties did not desire to wait for the bank to sell the premises or if they felt that the bank was not proceeding conscientiously, they could have filed a petition to

2. The bank promptly filed its petition after the delivery of the deed to Hoover. The petition was filed on December 16, 1977, less than a month after settlement.

have the judgment satisfied pursuant to section 7(a) of the act, 12 P.S. §2621.7(a).[3] Instead, they remained silent while the property was offered for sale and now argue that the bank was not justified in selling the premises before the bank filed its petition.

Certain of the sureties contend that they are not bound by any agreement giving the bank an extension of time because they did not attend the meetings in which the bank announced its intended course of action. However, we do not base our decision upon an agreement between the parties.[4] Rather, we have determined that, considering all the facts and circumstances of this case, the bank did not unduly delay or act in bad faith in connection with the delivery of the sheriff's deed. Since the bank filed its petition less than a month after the said delivery, the petition was timely filed in accordance with law.

## FAIR MARKET VALUE

The fair market value of the premises is to be determined as of April 9, 1976, the day of the sheriff's sale.[5] The traditional measure of fair market value is the price which a purchaser willing but not obligated to buy would pay to an owner willing but not obligated to sell: United States v. Branch Coal Corp., 285 F. Supp. 514 (E.D. Pa. 1968); Scottdale Savings and Trust Co. v. Jordan, 49 Westmoreland 69 (1967). A more detailed definition

3. This was the procedure followed by defendant in Shrawder. The Morellos filed such a petition, but their petition was filed after the bank had already filed its petition.

4. Section 10 of the deficiency judgment act, 12 P.S. §2626.10, expressly nullifies any waiver of the benefits of the Act.

5. 12 P.S. §2621.6.

of fair market value is found in Union National Bank of Pittsburgh v. Crump, 349 Pa. 339, 343, 37 A. 2d 733, 735 (1944): "Many elements properly enter into the determination of 'fair market value'. Among these are recent sales of real estate of comparable location and description . . . Other factors of value include (1) the uses to which the property is adopted and might reasonably be applied . . .; (2) the demand for the property and similar properties, taking into consideration economic conditions which depress market value in its true sense and detrimentally influence such demand . . .; (3) the income produced by the property including rents, and (4) generally, all elements which affect the actual value of property and therefore influence its fair market value. . . ." (Citations omitted.)

The bank's only valuation witness, Richard M. Bauman, a real estate expert, testified that the fair market value of the premises on April 9, 1976 was $445,000. On the other hand, Windmill's only valuation witness, Herbert J. Bellairs, a real estate expert, testified that the premises had a fair market value on April 9, 1976 of $840,000.[6] We are not bound to accept the testimony of any one expert but must evaluate all of the testimony, including the opinions of the experts, and determine fair market value on the basis of the record in its entirety: Union National Bank of Pittsburgh v. Crump, supra. In accordance with the standards cited above and considering the totality of the facts and circumstances, we have determined that the fair market value of the premises as of April 9, 1976 was $522,900.

Section 6 of the act provides that the fair market value as determined by the court shall not exceed the amount of the debt, interest, costs, taxes and

6. The valuation testimony of Bellairs was adopted by all of the sureties.

municipal claims: 12 P.S. §2621.6. The amount of the debt is disputed for the following reason. In addition to note no. 0347979 in the amount of $700,000, two other notes were executed by Windmill for smaller amounts. However, our determination of fair market value does not exceed the amount due on note no. 0347979[7] which is part of the debt under any theory. Therefore, we need not decide whether the "debt" includes the other two notes.

Evidence was introduced in these proceedings of various expenses incurred by the bank as mortgagee in possession. While the bank may ultimately be entitled to reimbursement for these expenses, a proceeding under the deficiency judgment act is not the appropriate forum for such a recovery. Section 6 of the act states as follows: "At such hearings the only issue before the court shall be the fair market value of the property sold at the time of said sale. . . . After the hearing and the determination by the court of the fair market value of the property sold the debtor, obligor, guarantor, and any other person liable directly or indirectly to the plaintiff . . . shall be released and discharged of such liability . . . to the extent of the fair market value of . . . [the] property . . . less the amount of all prior liens, costs, taxes and municipal claims not discharged by the sale, and also less the amount of any such items paid at the distribution on the sale . . . and thereupon petitioner may proceed by appropriate proceedings to collect the balance of the debt." 12 P.S. §2621.6.

In the present proceeding, there was no evidence of any prior liens, costs, taxes or municipal claims

7. The amount due on this note as of April 9, 1976 was $662,602.74.

which remained as encumbrances after the sheriff's sale. Therefore, no deductions should be made for the items listed in the first category. The second category of deductions, the amount of prior liens, costs, taxes or municipal claims paid at the distribution on the sale, is set forth in the sheriff's bill of costs. The said bill lists the total costs as $9,835.22 which figure includes $7,500 in realty transfer taxes.[8] Of this $7,500 in transfer taxes, the bank paid only $3,750, the remaining $3,750 having been paid by Hoover at settlement. Since the bank was only required to pay one-half of these transfer taxes, the deduction of realty transfer taxes should be in the amount of $3,750 rather than $7,500.[9] Subtracting $3,750 from the sheriff's bill of costs of $9,835.22, results in a total deduction of $6,085.22 for items in the second category. Since no deductions were made for items in the first category, the figure of $6,085.22 represents the total amount of deductions to be made from the fair market value. Subtracting $6,085.22 from $522,900 results in a figure of $516,814.78. Windmill and the sureties should be released and discharged from liability to the bank to the extent of the latter amount.

Certain of the sureties urge that we fix the fair market value of equipment which was sold in the execution proceedings. Section 1 of the act directs a

8. Certain of the sureties question the propriety of deducting realty transfer taxes on the ground that the said taxes are not "prior" taxes because they only become due after the vendue. However, these taxes represent an expense incurred by the bank in obtaining title and, therefore, are proper items of deduction: People's First National Bank & Trust Co. v. Hume, 50 D. & C. 2d 141 (1968).

9. The bank, in its proposed finding of fact number 43, lists the expense for realty transfer taxes as $3,750.

plaintiff to "petition the court having jurisdiction to fix the fair market value of the *real property* sold as aforesaid." 12 P.S. §2621.1. (Emphasis supplied.) In support of their position, a lower court opinion[10] is cited in which the court determined the fair market value of equipment which was covered by an industrial plant mortgage. However, in the present case, the record affords no basis for such a determination. Nor was the bank remiss in failing to establish the value of the equipment. Section 2 of the act, which prescribes the contents of a petition does not require an allegation of the value of equipment. Section 2 states that the petition shall, ". . . set forth the location and description of the *real property* sold . . . [and] shall contain a statement of the fair market value of the said property." 12 P.S. §2621.2. (Emphasis supplied.) Accordingly, we confine our valuation to the real property which was sold to Hoover at the Traiman Auction, i.e., the property which Hoover received in consideration of his $445,000 bid.[11] The equipment which was auctioned off separately at the Traiman sale for a total price of $51,941[12] is not included in our determination.

10. Lafayette Trust Co. v. Forrest Piece Dye Works, Inc., 37 Northamp. 64 (1963).

11. At settlement, the price of the realty was listed as $375,000 and the remainder of the $445,000 was allocated toward equipment. This procedure was only an accommodation for Hoover's convenience. Hoover's auction bid of $445,000 was solely for the real estate and the agreement of sale expressly provided: "The equipment, fixtures and other personal property is not included in this sale."

12. At certain points in the testimony, the figure of $47,841 is given as the price of the equipment. The difference between the two figures is the price of a diesel generator, the sale of which was rescinded. The discrepancy is immaterial in this proceeding in view of our decision not to determine the value of the equipment.

## CONCLUSIONS OF LAW

1. The period of time between the sheriff's execution sale of the premises and delivery of the sheriff's deed did not constitute undue delay.

2. The bank did not act in bad faith in connection with delivery of the deed for the premises.

3. The bank's petition to fix the fair market value of the premises was timely filed in accordance with law.

4. The total amount of all prior liens, costs, taxes and municipal claims not discharged by the sheriff's execution sale and the amount of such items paid at the distribution on the said sale is $6,085.22.

5. The fair market value of the premises as of April 9, 1976 was $522,900 and Windmill and the sureties should be released and discharged of liability to the bank to the extent of $516,814.78 on Windmill note no. 0347979.

6. The petition of Joseph J. Morello and Agnes L. Morello to satisfy the judgment should be dismissed.

7. The costs of these proceedings should be equally borne between the parties.

## DECREE NISI

And now, April 30, 1980 it is ordered and decreed that defendant Windmill Dairies, Inc., and the sureties: Ralph O. Phillips and Bertha M. Phillips; Isaac Yates, Jr. and Grace Yates; Richard E. Miller and Barbara M. Miller; Edward Wilson and Lola Vee Wilson; LaVern R. Phillips and Sandra Phillips; Carl Newhart and Rosemary Newhart; and Joseph J. Morello and Agnes L. Morello, be and hereby are released and discharged from liability to American Bank and Trust Co. of Pa. to the extent of $516,814.78 on Windmill Dairies, Inc. note no.

0347979; and it is further ordered and decreed that the petition of Joseph J. Morello and Agnes L. Morello to satisfy the judgment in the above-captioned matter is dismissed. The costs of these proceedings shall be equally borne between the parties.

This decree nisi shall become the final decree of this court unless exceptions are filed hereto within ten days hereof.